Rel: May 2, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

─────────────────────

### CR-2023-0304

─────────────────────

### Steven Richard Mulkey

### v.

### State of Alabama

### Appeal from Jefferson Circuit Court
### (CC-19-980)

WINDOM, Presiding Judge.

Steven Richard Mulkey appeals his capital-murder conviction and his sentence of death. Mulkey was convicted of murder made capital for intentionally killing Siu Mei Kao and Ching Kao by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code

1975.[1] The jury, after finding the existence of two aggravating circumstances, see §§ 13A-5-49(2) and 13A-5-49(9), Ala. Code 1975, unanimously sentenced Mulkey to death.

Facts

In the summer of 2018, Mulkey quit his job in construction and began earning money by performing various odd jobs for businesses in Irondale. The Kaos, an elderly couple who owned a motel and an office building in the area, hired Mulkey to mow the grass at their properties as well as to assist them with basic maintenance and renovations at their motel.

Lieutenant Jason Hill of the Irondale Police Department knew the Kaos well from his frequent visits to their motel while he was on patrol, and he likewise was familiar with Mulkey as the Kaos' handyman. On September 18, 2018, Lt. Hill was on patrol at 2:30 a.m. when he passed the Kaos' motel and noticed that all the lights, including the office lights, were off. Lt. Hill found this to be peculiar. When he noticed a vehicle driving around to the back of the motel, he decided to investigate.

---

[1]The jury acquitted Mulkey of two counts murder made capital for intentionally killing Siu Mei Kao and Ching Kao during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975.

Lt. Hill entered the motel's parking lot and recognized that the vehicle that he had seen was of one of the Kaos' vehicles, a beige Chevrolet Impala. The Impala was heading toward Lt. Hill's patrol vehicle, and he illuminated his emergency lights for it to stop. The Impala stopped beside his patrol vehicle, and Lt. Hill recognized Mulkey as the driver. Lt. Hill questioned Mulkey about his presence at the motel so early in the morning, and Mulkey explained that the Kaos were out of town and that he was there to feed their dog. According to Mulkey, he had intended to feed the dog at 5:00 p.m. the previous day but had fallen asleep. Although Lt. Hill was suspicious, he found Mulkey's statements to be reasonable because the Kaos had recently told Lt. Hill that they were planning a trip to visit their daughter. Nonetheless, Lt. Hill asked for and received Mulkey's identification, which he logged into his dashboard computer. Lt. Hill allowed Mulkey to leave, unaware that the motel's office safe was in the backseat of the Impala and the Kaos' bodies were in the trunk.

Mulkey drove to Graysville, where he cut open the top of the safe. Mulkey withdrew "a lot of American currency and foreign currency, with a whole lot of paperwork such as passports, things of that nature." (R.

936-37.) Mulkey then drove to Leeds, where he dumped the Kaos' bodies in a wooded area. Mulkey abandoned the Impala at a USA Econo Lodge motel, the motel at which Mulkey had been living, and purchased a Dodge Charger vehicle with money taken from the Kaos' safe.

The Kaos were soon reported as missing. On September 21, 2018, the Kaos' Impala was located; in the trunk, officers found the Kaos' emptied safe and apparent blood stains. Detective Clint Ballard, with the assistance of the Kaos' daughter, entered the motel office, where he saw what appeared to be bloody drag marks on the floor and blood spatter on the walls. Det. Ballard accessed and reviewed footage captured by the motel's surveillance system, which, as he described for the jury, captured the murder of the Kaos. Det. Ballard took a photograph of the perpetrator and sent it to Lt. Hill, who readily identified Mulkey as the person in the image.

The first video depicted the murder of the Kaos, which had occurred on September 16. The video begins with an ailing Ching in the motel office, struggling to lie down on a couch. Siu Mei arrives and assists her husband to the couch. Siu Mei leaves the office just before Mulkey enters, whereupon he engages Ching in a conversation. The conversation

appears to escalate into an argument, as Ching waves his right arm at Mulkey and Mulkey gesticulates at Ching. After a few minutes, Siu Mei returns to the office and soon joins the argument. Mulkey then withdraws a hammer from his pants and steps closer to the Kaos. Mulkey strikes a still-recumbent Ching in the head, and Siu Mei lunges for the hammer. Mulkey strikes Siu Mei in the head several times. On one swing, however, Siu Mei is able to grab the hammer, and, for the next 45 seconds, the two struggle for its control. Mulkey, apparently unable to wrest control of the hammer from an elderly Siu Mei, grabs a knife that is lying on a table and uses it to slash several times at Siu Mei's neck. Mulkey is finally able to regain control of the hammer, and he returns to striking Siu Mei in the head. At this point, Mulkey walks out of sight of the surveillance camera but returns when Ching can be seen moving his right arm. Using the hammer again, Mulkey strikes Ching in the head. Mulkey then drags Ching's body off the couch toward the back of the office.

A series of videos from September 18 show Mulkey returning to the motel office and using a shopping cart to haul the Kaos' bodies to the trunk of a vehicle. Mulkey then retrieved the safe from the motel office

and loaded it into the vehicle. Finally, Lt. Hill's patrol vehicle can be seen entering the motel's parking lot, and Lt. Hill himself can be seen inspecting the premises.

Det. Ballard obtained a warrant for Mulkey's arrest and contacted the United States Marshals Service for help in locating him. A search of Mulkey's room at the USA Econo Lodge yielded a gym bag that contained a receipt for the room with Mulkey's name and a knife with a red substance on it. When Mulkey learned that marshals were searching for him, he abandoned the Charger, purchased a Chevrolet Tahoe sport-utility vehicle, and headed north toward New York. Mulkey, however, was apprehended by marshals in Staunton, Virginia.

Det. Ballard traveled to Staunton and interviewed Mulkey in the county jail. Mulkey divulged to Det. Ballard the location of the Kaos' bodies. At trial, Mulkey explained that, on September 16, he had agreed to mow the lawn at the Kaos' office building for $50. Mulkey stated that he smoked marijuana while mowing and that, when he was finished with the job, Siu Mei drove him back to the Kaos' motel. According to Mulkey, while he was returning the lawnmower to the storage room, he ingested a "whole gram sack" of cocaine laced with methamphetamine. (R. 928.)

6

Mulkey grabbed his tools for some maintenance work he had discussed with the Kaos. Mulkey spoke with Ching, and an argument ensued. Mulkey stated that Ching offered him only $20 for mowing the lawn at the office building, instead of the agreed-upon $50. At that point, Mulkey "lost it" and "blacked out." (R. 929-30.) Mulkey asserted that he "woke up and looked around" and realized that he had killed both Ching and Siu Mei. Mulkey dragged the bodies to the back of the office and went back to his room at the USA Econo Lodge. Mulkey testified that he returned early on the morning of September 18 to dispose of the bodies because he "just wanted it all to go away, [like] it never happened." (R. 934.)

## Standard of Review

Rule 45A, Ala. R. App. P., as amended effective January 12, 2023, provides:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

This Court will continue to review the entire record for plain error in all cases in which the death penalty has been imposed.

> " 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018). That said,

> "[b]ecause plain-error review is now discretionary, it is no longer necessary for this Court to address in its opinions every issue that is subject only to plain-error review and, even if we choose to address those issues, we are not required to engage in the type of in-depth analyses as we have in the past."

Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). With these principles in mind, this Court will address Mulkey's claims in turn.

## I.

Mulkey argues that the circuit court abused its discretion by placing him in prison clothes and physical restraints during the penalty phase of his trial. Mulkey's restraints, which bound him to his rolling chair, were visible to the jury, and Mulkey argues that they were so restrictive that they hampered his ability to confer with counsel. Mulkey asserts that forcing him to appear before the jury during the penalty phase in visible restraints and prison garb prejudiced the jury against him and violated his rights to due process, to participate in his own defense, to a fair trial, and to a reliable conviction and sentence.

This Court can readily dispose of Mulkey's claim that the circuit court abused its discretion by forcing him to wear prison clothes during the penalty phase. It is true that, generally speaking, compelling a defendant to stand trial in prison clothes violates his right to a fair trial. Estelle v. Williams, 425 U.S. 501, 512 (1976). "'The presumption of innocence ... is a basic component of a fair trial under our system of criminal justice,'" and "'courts must be alert to factors that may undermine the fairness of the fact-finding process.'" Knight v. State, 300 So. 3d 76, 92 (Ala. Crim. App. 2018) (quoting Estelle, 425 U.S. at 503). "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment," thereby undermining the defendant's presumption of innocence. Estelle, 425 U.S. at 504-05.

Yet, at the time Mulkey was compelled to appear before the jury in prison clothes, he was no longer cloaked with a presumption of innocence because he had already been convicted of capital murder. Further, Mulkey's "condition as a prisoner is no surprise to the jury, which just found him guilty. Prison clothing cannot be considered inherently prejudicial when the jury already knows, based upon other facts, that the

defendant has been deprived of his liberty." Duckett v. Godinez, 67 F.3d 734, 747 (9th Cir. 1995). See Estelle, 425 U.S. at 507 (recognizing that "[n]o prejudice can result from seeing that which is already known").

However, shackling, particularly visible shackling, is another matter. Like prison clothes, "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." Deck v. Missouri, 544 U.S. 622, 630 (2005). The Supreme Court of the United States has recognized two other considerations impacted by shackling. One is that shackles "can interfere with the accused's 'ability to communicate' with his lawyer, [and] can interfere with a defendant's ability to participate in his own defense," which diminishes a defendant's right to counsel. Id. at 631. The other is that "the use of shackles at trial 'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" Id. (quoting Illinois v. Allen, 397 U.S. 337, 344 (1970)).

Unlike with prison clothes, "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases." Deck, 544 U.S. at 632.

11

"This is obviously so in respect to the latter two considerations mentioned, securing a meaningful defense and maintaining dignified proceedings. It is less obviously so in respect to the first consideration mentioned, for the defendant's conviction means that the presumption of innocence no longer applies. Hence shackles do not undermine the jury's effort to apply that presumption.

"Nonetheless, shackles at the penalty phase threaten related concerns. Although the jury is no longer deciding between guilt and innocence, it is deciding between life and death. That decision, given the '"severity"' and '"finality"' of the sanction, is no less important than the decision about guilt. Monge v. California, 524 U.S. 721, 732 (1998) (quoting Gardner v. Florida, 430 U.S. 349, 357 (1977)).

"Neither is accuracy in making that decision any less critical. The Court has stressed the 'acute need' for reliable decisionmaking when the death penalty is at issue. Monge, supra, at 732 (citing Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)). The appearance of the offender during the penalty phase in shackles, however, almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community – often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point. Cf. Brief for Respondent 25-27. It also almost inevitably affects adversely the jury's perception of the character of the defendant. See Zant v. Stephens, 462 U.S. 862, 900 (1983) (REHNQUIST, J., concurring in judgment) (character and propensities of the defendant are part of a 'unique, individualized judgment regarding the punishment that a particular person deserves'). And it thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations – considerations that are often unquantifiable and elusive – when it determines whether a defendant deserves death. In these ways, the use of shackles can be a 'thumb [on] death's side of

12

the scale.' <u>Sochor v. Florida</u>, 504 U.S. 527, 532 (1992) (internal quotation marks omitted); <u>see also</u> <u>Riggins[ v. Nevada]</u>, 504 U.S. [127], at 142 [(1992)] (KENNEDY, J., concurring in judgment) (through control of a defendant's appearance, the State can exert a 'powerful influence on the outcome of the trial').

"Given the presence of similarly weighty considerations, we must conclude that courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding."

<u>Deck</u>, 544 U.S. at 632-33.

In <u>Deck</u>, the defendant was convicted of two counts of first-degree murder for robbing and killing an elderly couple and was sentenced to death. During the penalty phase, the defendant had been required to appear before the jury visibly shackled with leg irons, handcuffs, and a belly chain. The defendant argued before the Supreme Court of the United States that visible shackling during the penalty phase was unconstitutional. The State asserted, in part, that allowing the shackles was within the discretion of the trial court. This argument was rejected:

"The second argument – that the trial court acted within its discretion – founders on the record's failure to indicate that the trial judge saw the matter as one calling for discretion. The record contains no formal or informal findings. Cf. <u>supra</u>, at 632 (requiring a case-by-case determination). The judge did not refer to a risk of escape – a risk the State has raised in this Court, see Tr. of Oral Arg. 36-37 – or a threat to courtroom security. Rather, he gave as his reason for

13

imposing the shackles the fact that Deck already 'has been convicted.' App. 58. While he also said that the shackles would 'tak[e] any fear out of' the juror's 'minds,' he nowhere explained any special reason for fear. Id., at 59. Nor did he explain why, if shackles were necessary, he chose not to provide for shackles that the jury could not see – apparently the arrangement used at trial. If there is an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling, it is not this one."

Deck, 544 U.S. at 634-35.

Mulkey asserts that the circuit court's reasoning for shackling him to his chair mirrored those of the trial court in Deck and that, consequently, the holding of Deck requires this Court to reverse his sentence of death. To be sure, the circuit court, in explaining the decision to shackle Mulkey, mentioned several times that Mulkey had lost his presumption of innocence. Mulkey's argument loses force, however, when the full record is considered.

Mulkey's behavior in the courtroom was a concern even before trial. Mulkey was admonished by the circuit court for an outburst during a pretrial hearing regarding the admissibility of the surveillance footage from the motel office. (R. 61.) During an ex parte hearing held before voir dire, defense counsel asked the circuit court to caution Mulkey about his courtroom behavior and sought clarification about any security

14

measures the circuit court intended to employ. (R. 124.) The circuit court agreed and stated that Mulkey would wear a suit, which could be provided by the court if necessary, and that he would not be visibly shackled. However, the circuit court planned for Mulkey to be fitted with a stun belt, to be worn underneath his suit, and to have extra security – two to three extra deputies – sitting in the back of the courtroom. The circuit court explained that its decision was "[b]ased on previous behavior." (R. 128.) The circuit court issued Mulkey a second warning before voir dire, and Mulkey responded: "In the jail, yes, I have done a lot of bad things, said a lot of wrong things." (R. 165.) Mulkey assured the circuit court, though, that he would behave in the courtroom.

Mulkey's assurance appears to have held true, at least through the guilt phase of the trial. Yet, when defense counsel asked the circuit court, following the jury's verdict, how Mulkey would be dressed for the penalty phase, the circuit court determined that Mulkey would be restrained:

Defense: "Moving forward, how does the Court intend to handle Mr. Mulkey dressing?"

Court: "At this point, he no longer has the presumption of innocence, and so you all do not have to dress him back out. I'm going to think about shackles."

Defense: "That's sort of where I was going with that. I'm not sure what the Court wanted to do."

Court: "I'm actually going to put shackles on him."

Defense: "For record purposes, we would object. I understand the Court's position."

Court: "So noted. Overruled. So he will be in – he can be in regular jail clothes. And now, without the presumption of innocence, I will look to protect all members of the jury as well as court personnel."

(R. 1115.) The circuit court somewhat expounded on his reasoning as it prepared to begin the penalty phase:

"I just want to let Mr. Mulkey know that the reason that you are in that [restraining] chair now is because, based on the conviction, you lost your presumption of innocence. We did everything to protect that presumption, but, now, based on the fact that you are convicted of capital murder, and based on the prior threats, the issues and concerns that we've had, the Court has elected to actually have you in the restraining chair."

(R. 1116).

The circuit court further clarified its reasoning at the hearing on Mulkey's motion for a new trial. Newly appointed appellate counsel asserted that during the penalty phase Mulkey "was strapped in a rolling restraint chair, handcuffed and shackled at the feet, and held with what appeared to be seat belt clips which kept his arms down where he was

16

basically just moving his head and neck." (R. 1473.) Appellate counsel argued that the restraints limited Mulkey's ability to consult with counsel and prejudiced the jury against him. Appellate counsel also questioned the number of security personnel in the courtroom. According to appellate counsel, there was no "evidentiary basis … or any compelling need for [Mulkey] to be restrained in this fashion." (R. 1473.) In response, the prosecutor reminded the circuit court that, "after the verdict was read by the jury, and as [Mulkey was] being placed into custody, in handcuffs and taken back down to the jail, he resisted. And he threatened a deputy." (R. 1477.) The circuit court's response to Mulkey's claim was thorough:

"In regards to the chair, the restraining chair, Mr. Mulkey behaved exemplary during the actual guilt phase of the trial. However, as [the prosecutor] has correctly stated, when being taken down – and it was outside the presence of the jury, Mr. Mulkey did become combative with – and there was more than one deputy. There was actually about four or five deputies that had to actually restrain and then take Mr. Mulkey in to the jail.

"But in addition to that, part of why I chose to then use the chair was, again, because he did not have the presumption of innocence anymore. But throughout this case, there were multiple threats made to each and every personnel member in this courtroom. Mr. Mulkey went as far as threatening the life of his counsel, one who I had to allow to withdraw because

17

of those threats. Threatened the prosecutor specifically. Threatened the Court specifically.

"And I'm going to put on the record that at one point there was the statement that: The Judge is going to be the new face of Black Lives Matter.[2] It took me a while to understand what that meant, but I took that then as a threat.

"And then, once this jury had reached that verdict, I could not and would not take the chance that I allowed anyone's life to be placed in danger or their safety to be placed at risk.

"Additionally, although he didn't do this during the trial, Mr. Mulkey was found in possession of a shank on the morning he was to testify, and that's when he knew he would be up by the Court and in the witness stand.

"And so although he didn't do anything on that day, I still allowed him to keep his presumption of innocence. I had officers by him, but the only time any officer was ever within arm's reach of Mr. Mulkey was when he was testifying. At all other times there were multiple officers in the courtroom, but none were ever within arm's reach except when he was a few feet, probably four or five feet from the jury, and about two feet from the Court.

"At all other times there were multiple officers there, but none were ever in arm's reach. And I don't think that there was any implication from that, that the jury drew anything improper. I don't think they assumed he was ever

---

[2]"Black Lives Matter" is a political and social movement that highlights instances of what it perceives to be police brutality and racially motivated violence. The movement gained international prominence in the wake of the killing of George Floyd by a police officer in 2020. Judge Alaric May, who presided over Mulkey's capital-murder trial, is black.

18

in custody, because I don't think any juror ever saw one of the officers put their hand on him at all.

"Even when we took him to the jail and brought him up, we always made sure that the jury was gone off of the entire floor before we ever did that. And, again, that was all during the guilt phase.

"So I don't think his rights were violated during the penalty phase just because, again, at that point he did act out. At that point, he didn't have the presumption of innocence."

(R. 1484-87.)[3]

Mulkey is correct that he generally had a constitutional right to appear before the jury in the penalty phase without the use of restraints. But, Mulkey waived that right through his own conduct, as detailed by the circuit court. This Court has held that "[e]very court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it." Wood v. State, 699 So. 2d 965, 966 (Ala. Crim. App. 1997). In Deck, the Supreme Court

---

[3]Mulkey complains in his reply brief that the circuit court's justification occurred two months after he was restrained. Yet, this was when the circuit court was pressed for a justification by newly appointed appellate counsel. When the circuit court announced its decision to restrain Mulkey at trial, defense counsel, who was well aware of Mulkey's actions and statements, objected but acknowledged: "I understand the Court's position." (R. 1115.)

of the United States recognized the same: "The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." 544 U.S. at 633. The Supreme Court required, though, that "any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial." Id. Mulkey himself admitted to the circuit court that he had "done a lot of bad things" while incarcerated awaiting trial. (R. 165.) And, the circuit court articulated specific security concerns based on Mulkey's conduct – his threats against the circuit court and counsel, his being caught with a weapon on the morning he was set to testify, and his resisting being taken into custody following the jury's finding him guilty.

Mulkey pushes back on this final justification – Mulkey's resisting being taken into custody – arguing that reliance on this incident is "unpersuasive because the trial court announced its decision to restrain Mr. Mulkey before it adjourned after the guilt-phase verdict, and thus before Mr. Mulkey was even removed from the courtroom." (Mulkey's reply brief, at 9 (emphasis in original).) Although it is true that the

circuit court declared that Mulkey would be restrained before his removal from the courtroom (R. 1115), a careful reading of the record shows that the circuit court did not announce the extent of the intended restraints. In other words, there is no indication that the circuit court intended to <u>visibly</u> restrain Mulkey, and any suggestion otherwise is a mere assumption.

What <u>is</u> known is that, at the time visible restraints were placed on Mulkey, he had been convicted of a violent double homicide, he had threatened the lives of multiple individuals involved with the trial, he had been caught with a weapon on the day he was to be in close proximity to the judge and jury, and he had been physically combative with courtroom security personnel to the point that he had to be restrained by four or five deputies. Mulkey asserts that lesser security would have sufficed, yet, given Mulkey's conduct both inside and outside the courtroom, this Court has no trouble concluding that the circuit court acted within its discretion in placing Mulkey in visible restraints. <u>See</u> <u>Brown v. State</u>, 982 So. 2d 565, 596 (Ala. Crim. App. 2006); <u>Wood</u>, 699 So. 2d at 966-67. Therefore, this issue does not entitle Mulkey to any relief.

II.

Mulkey argues that the circuit court erred in failing to instruct the jury on the lesser-included offense of manslaughter due to voluntary intoxication. See § 13A-6-3, Ala. Code 1975. "While voluntary intoxication is not a defense to a criminal charge, it can negate the specific intent necessary for an intentional murder, reducing the offense to manslaughter." Ex parte McWhorter, 781 So. 2d 330, 340 (Ala. 2000). Mulkey testified at trial that, before the murders, he had smoked marijuana and ingested "a whole gram sack" of cocaine laced with methamphetamine. (R. 927-28.) Mulkey also points to evidence from Dr. Jennifer Wilson indicating that Mulkey had long battled substance abuse.

Mulkey asked for and received instruction from the circuit court on intoxication. Specifically, the circuit court instructed the jury:

> "A defense asserted in this case is intoxication by use of marijuana, cocaine, and methamphetamine. Intoxication is a disturbance of mental or physical capacity resulting from the introduction of any substance into the body.
>
> "Voluntary intoxication means intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to the charge. Voluntary intoxication

22

does not excuse a crime, but its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent.

"Intoxication is not a defense to any offense generally. However, intoxication of the defendant, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense such as intent.

"Where a certain mental state is an essential element of the crime and a person was so intoxicated that he could not form that mental state, the mental state would not exist and, therefore, the crime could not be committed.

"In Alabama, voluntary intoxication does not excuse a criminal act. However, drunkenness due to liquor or drugs, may render a defendant incapable of forming or entertaining a specific intent or some mental element that is essential to the crime. Under the law[,] voluntary intoxication arises from a disturbance of mental or physical capacity resulting from the introduction of any substance in the body. The degree of intoxication required to establish that the defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. Stated differently, the level of intoxication needed to negate intent must rise to the level of statutory insanity.

"Under Alabama law, voluntary intoxication can only negate specific intent if it amounts to insanity. It must be so extreme that it renders the defendant incapable of consciousness that he is committing a crime and incapable of forming the design to take a life. The defendant must be so devoid of judgment, his intoxication must have been so extreme, that his mental capacities are paralyzed and he must not know what he is doing.

"While voluntary intoxication, in and of itself, is never a defense to a criminal charge, it may negate the specific intent

23

essential to a malicious killing. You must decide whether the defendant was intoxicated at the time of the alleged crime and, second, whether the defendant was incapable of forming the intent to commit acts constituting the offense of capital murder."

(R. 1087-89.) Mulkey did not, however, request an instruction on the lesser-included offense of manslaughter due to voluntary intoxication.[4] Therefore, this issue will be reviewed for plain error only.

> "'"'When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' Gray v. State, 482 So. 2d 1318, 1319 (Ala. Cr. App. 1985)." McNeill v. State, 496 So. 2d 108, 109 (Ala. Cr. App. 1986).'
>
> "[McConico v. State, 551 So. 2d [424,] 426 [(Ala. Crim. App. 1988)]. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity."

Smith v. State, 756 So. 2d 892, 906 (Ala. Crim. App. 1997) (on return to remand).

Inasmuch as the jury found that Mulkey had the specific intent to kill the Kaos despite being instructed multiple times by the circuit court

---

[4]Given defense counsel's closing arguments, it appears the defense was attempting to use Mulkey's alleged intoxication in conjunction with his alleged mental-health issues to support a verdict of not guilty by reason of mental disease or defect. (R. 1039-40.)

that intoxication could negate the specific intent to kill, it is rather obvious that the jury did not accept Mulkey's intoxication defense. Further, the evidence of Mulkey's alleged intoxication came from Mulkey's own self-serving statements, made either during his trial testimony or during his forensic examinations, and was inconsistent with the surveillance footage of the murders, which showed Mulkey methodically kill the Kaos, drag the bodies to the back of the office in an apparent attempt to hide them, and then leave the scene. See Cunningham v. State, 426 So. 2d 484, 490 (Ala. Crim. App. 1982) (the manner in which a crime is planned, executed, or concealed may indicate a consciousness of guilt and awareness of criminality). Mulkey also returned to the scene multiple times to further conceal the Kaos' murders, which indicates that he was aware not only of what he had done but also of the wrongness of his actions. Further, there was no testimony offered to explain the effects of the substances Mulkey had ingested or how those substances could have caused Mulkey to be so intoxicated that he could not form the specific intent to kill for a period of approximately two minutes.

Because there was no substantial evidence indicating that at the time of the murders Mulkey was intoxicated to such a degree that the alleged intoxication amounted to insanity, the circuit court did not commit error, plain or otherwise, in failing to charge the jury on the lesser-included offense of manslaughter.  See Ex parte McWhorter, 781 So. 2d 330, 341-43 (Ala. 2000).  Therefore, this issue does not entitle Mulkey to any relief.

## III.

Mulkey argues that placing a veniremember in contempt of court in front of the entire jury pool before voir dire constituted an abuse of power.  Mulkey asserts that the circuit court's actions unlawfully excluded a veniremember from jury service and compromised the integrity of his jury selection and trial.

Following introductions and some general instructions, the veniremembers were given a juror questionnaire to complete.  Once the questionnaires were completed and collected, the veniremembers were told that the circuit court would be in recess until the following morning and that they should "make sure that you're here back in your seats by 9 o'clock so we can start."  (R. 216.)  At 9:30 a.m. the following morning, the

26

circuit court announced to the venire that he was ready to begin but that a member of the venire had not arrived. The circuit court stated that the veniremember had just been contacted and indicated that he "was getting dressed to come down." (R. 228.) The circuit court announced that it would not delay the proceedings further and that the veniremember would be held in contempt. Mulkey did not object to the circuit court's actions. Therefore, this issue will be reviewed for plain error only.

Alabama courts have the authority to issue orders to prevent hindrance of its proceedings, § 12-1-7(1), Ala. Code 1975, and "[t]o control ... all other persons connected with a judicial proceeding before it in every matter appertaining thereto." § 12-1-7(4). Moreover, Mulkey's assertion of prejudice is wildly speculative. This Court finds no plain error in the circuit court's actions.

IV.

Mulkey argues that the circuit court erred by admitting testimony regarding Mulkey's prior bad acts. Mulkey refers to his testimony on cross-examination in response to questions from the State regarding threats he purportedly levied at Dr. Robert Bare, who was the first forensic examiner tasked by the circuit court with evaluating Mulkey.

Mulkey asserts that the evidence was irrelevant and highly prejudicial and that, even if the evidence were admissible, the circuit court further erred by failing to instruct the jury on the use of the evidence. See Ex parte Billups, 86 So. 3d 1079, 1086 (Ala. 2010). Mulkey did not object to the cross-examination or his given answers. Therefore, this issue will be reviewed for plain error only.

Contrary to Mulkey's claim on appeal, there was no evidence of prior bad acts to which Mulkey testified:

State: "Do you recall Dr. Bare coming to see you?"

Mulkey: "I recall a lot of doctors. I recall them more by face than what I would name."

State: "This is the one that you threatened, so, therefore, he had to get off your case and that's why Dr. Wilson became your psychologist. Do you understand that?"

Mulkey: "I remember that time vicinity within the jail, I do."

State: "And do you remember threatening him?"

Mulkey: "I also remember being –"

State: "Answer my question. Do you recall threatening him?"

28

Mulkey: "I don't recall exactly what was said between us, but there was a disagreement between us of some nature."

State: "Are you denying that you made statements to him that were threatening?"

Mulkey: "I don't exactly recall what statements were made."

State: "Do you recall telling him that if this evaluation came back to bite you in the ass, that he shouldn't come back to the jail? Do you remember telling him that?"

Mulkey: "I do – in a certain extent, yes, I do recall having them type of arguments with certain psychologists. He's not the only one. Once again, they only do half their homework."

State: "Do you remember telling him that, 'When I see somebody affiliated with the State, I just want to tear their throat out'?"

Mulkey: "I don't recall saying that. I do recall saying I don't trust them."

(R. 972-73.) Although he was prompted to offer such evidence, Mulkey offered only evasive answers and did not admit to any prior bad acts. Mulkey's assertion otherwise is without merit. Additionally, because Mulkey did not offer evidence of prior bad acts, no limiting instruction was required of the circuit court.

29

The circuit court did not commit error, plain or otherwise, in allowing Mulkey's testimony or in failing to instruct the jury about the proper use of the testimony. Therefore, this issue does not entitle the Mulkey to any relief.

V.

Mulkey argues that the circuit court erred by allowing prosecutorial misconduct at the guilt and penalty phases of his trial. Specifically, Mulkey asserts that the circuit court should have excluded arguments from the prosecutor: a) that improperly injected the issue of residual doubt by telling the jury in penalty-phase closing arguments that they did not need to worry whether Mulkey was "the right guy" or that DNA evidence would someday exonerate him (R. 1427); b) that improperly commented on facts not in evidence by telling the jury in penalty-phase closing arguments that Mulkey's facial tattoos of teardrops indicated he was "proud of [the murders]" (R. 1431); c) that improperly inflamed the passions of the jury by telling the jury during guilt-phase closing arguments that the Kaos "didn't get the luxury of living out their lives until they were naturally over" but instead "went out on Steven Mulkey's time," (R. 1025); and d) that improperly injected victim-impact evidence

30

by presenting evidence in the guilt phase about the Kaos life story and indicating that Lt. Hill knew the Kaos well and by arguing during closing arguments that the Kaos were the "embodiment of the American dream" (R. 1024-25) and that the impact of the Kaos death on the Kaos' family and community was significant. Mulkey did not object to the allegedly improper arguments or evidence. Therefore, this issue will be reviewed for plain error only.

"Comments made by the prosecutor must be evaluated in the context of the whole trial," Duren v. State, 590 So. 2d 360, 364 (Ala. Crim. App. 1990), and "[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Kuenzel v. State, 577 So. 2d 474, 489 (Ala. Crim. App. 1990). "If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict." Smith v. State, 698 So. 2d 189, 202-03 (Ala. Crim. App. 1996).

This Court has carefully reviewed the arguments alleged by Mulkey to constitute prosecutorial misconduct and concludes that none of the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Moreover, we are confident that the alleged victim-impact evidence did not distract the jury or keep it from performing its duty of determining Mulkey's guilt or innocence based on the admissible evidence and the applicable law. See Ex parte Rieber, 663 So. 2d 999, 1006 (Ala. 1995). Therefore, this issue does not entitle the Mulkey to any relief.

## VI.

Mulkey argues that his death sentence is unconstitutional because he is "intellectually disabled." The Supreme Court of the United States and the Alabama Supreme Court have recognized that "it is unconstitutional to impose a death sentence upon a defendant with an intellectual disability." Carroll v. State, 300 So. 3d 59, 62 (Ala. 2019) and Atkins v. Virginia, 536 U.S. 304 (2002). Mulkey asserts that he has a full-scale IQ score of 72 and that he suffers from multiple adaptive deficits that manifested before he turned 18 years old. Mulkey argues

32

that the circuit court erred in determining that he is not intellectually disabled and that, at a minimum, this Court should remand this cause for further proceedings on his <u>Atkins</u> motion.

Before Mulkey moved for and was granted funds to retain the services of an expert to perform an evaluation to determine whether Mulkey suffered from any intellectual disability. (C. 38-42, 37.) On November 30, 2020, Mulkey filed a motion to have himself declared ineligible for the death penalty under <u>Atkins</u>. (C. 390-94.) The motion asserted that counsel had reviewed the preliminary findings of various experts and that counsel had a good-faith basis for believing that Mulkey was intellectually disabled. A hearing on Mulkey's <u>Atkins</u> motion was set for April 8, 2021.

A few weeks before the hearing was scheduled to occur, Dr. Bare, a forensic examiner, filed a report detailing his examination of Mulkey. (C. 110-12.) The report noted that he had met with Mulkey on March 5, 2021, and that Mulkey was "quite hostile, angry, and agitated." Mulkey questioned Dr. Bare as to whether he was working for the prosecution or the defense; Dr. Bare answered that he was a neutral party. Dr. Bare reported that "Mulkey became angry and indicated that he was reluctant

33

to participate in the evaluation, instructing me not to lie to him," and then Mulkey "added that if the evaluation 'came back to bite [him] in the ass, that [Dr. Bare] shouldn't come back to the jail.'" (C. 110.) Mulkey later told Dr. Bare: "'When I see somebody affiliated with the State, I want to tear their throat out.'" (C. 111.) Dr. Bare did not conduct an intelligence assessment of Mulkey as he had been directed to do by the circuit court. Dr. Bare stated that he was concerned that the results of the evaluation would be invalid due to Mulkey's "inattention, hostility, and irritability." (C. 111.)

The hearing scheduled for April 8, 2021, did not occur. According to the circuit court, defense counsel had "informed the Court that there were no viable Atkins issues present for consideration, and therefore the scheduled hearing could be cancelled." (Second Supp. C. 225.) Nevertheless, Mulkey, following the cancellation of the hearing, filed a second Atkins motion, generally alleging that he was intellectually disabled.

The circuit court ordered a second forensic examination, which was conducted by Dr. Jennifer Wilson on April 22, 2021. In a report issued on May 11, 2021, Dr. Wilson found that Mulkey's "speech was

34

spontaneous, coherent, and average in rate, tone, and volume," that his "answers were relevant to questions asked," and that his "thought processes were generally organized, goal-oriented, and logical." (C. 124.) Although she did not conduct a full <u>Atkins</u> evaluation because the circuit court had determined it was "no longer needed," Dr. Wilson opined that, "[b]ased on his educational history, conversational vocabulary, and general fund of knowledge," Mulkey's "intellectual functioning was estimated to fall in the low average range." (C. 120, 124.)

On September 28, 2021, the circuit court held a hearing on Mulkey's second <u>Atkins</u> motion. Defense counsel offered no evidence, though, electing to "stand on our pleadings." (R. 96.) The State reminded the circuit court of Dr. Bare's attempted forensic examination, which was thwarted by Mulkey, and that defense counsel had "essentially told the Court, as well as the State, that based upon an expert that they had hired, they really didn't feel like they had any grounds for an <u>Atkins</u> issue." The State questioned why Mulkey had filed the second motion if, in fact, defense counsel had no grounds to believe he was intellectually disabled and suggested that if "they think it's an issue, then maybe we need to have [Mulkey], once again, try to be evaluated for an <u>Atkins</u>

evaluation." The circuit court turned to defense counsel, who explained their position:

> "I mean, obviously the Court can only consider the evidence put in front of it. If we choose not to call anybody, then the Court can rule against us and that's perfectly fine. We can still preserve the issue by filing it. If we don't present sufficient evidence or it doesn't meet the threshold and the State says well, there's no evidence so you shouldn't rule in their favor, so be it. It doesn't matter."

(R. 99-100.) Defense counsel added that they did not bring any witnesses to support the Atkins motion. The circuit court denied the motion.

For a defendant to be considered "intellectually disabled," a defendant "must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior." Ex parte Perkins, 851 So. 2d 453, 456 (Ala. 2002). "Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18.)." Id. The defendant bears the burden of establishing an intellectual disability by a preponderance of the evidence, and a trial court's determination is entitled to deference on appeal. Carroll v. State, 300 So. 3d 59, 61 (Ala. 2019). A trial judge exceeds his or her discretion when there is no evidence on which the judge could have rationally based his or her

36

decision regarding the defendant's intellectual disability. Ex parte Lane, 286 So. 3d 61, 66 (Ala. 2018).

Mulkey was granted a hearing on his motion, at which he elected to rely on defense counsel's unsworn assertion in the Atkins motion that Mulkey was intellectually disabled. Mulkey made no attempt to offer any evidence in support of his claim and all but invited the circuit court to deny his Atkins motion. If it needs to be said, the circuit court did not abuse its discretion in denying Mulkey's Atkins motion.

Mulkey asserts, though, that he offered evidence during the penalty phase to support his claim that he is intellectually disabled – testimony that he had an IQ score of 72, that he suffers from fetal alcohol syndrome, and that he suffers from adaptive deficits in communication, self-care, social skills, self-direction, and work – that warranted further proceedings . Yet, none of Mulkey's experts diagnosed him as being intellectually disabled, and much of his alleged adaptive deficits were not specifically diagnosed but rather were plucked from evidence of developmental delays he had experienced as a child. (R. 1315-80.) See Smith v. State, 213 So. 3d 239, 248 (Ala. 2007) (recognizing that, for a

defendant to be considered intellectually disabled, the defendant must currently exhibit deficits in adaptive behavior).

Regardless, this evidence was not presented in the context of an Atkins claim, and, even if it had been, it failed to indicate that Mulkey is intellectually disabled. See Ex parte Perkins, 851 So. 2d at 457.[5] We find no error, plain or otherwise, in the circuit court's failing to hold further proceedings in light of this evidence. Therefore, this issue does not entitle Mulkey to any relief.

## VII.

Mulkey argues that the circuit court erred by informing the jury that its penalty-phase verdict was merely a recommendation, which resulted in the return of an advisory verdict. The penalty-phase verdict form returned by the jury offered the following options: "We the jury, recommend that the Defendant, Steven Richard Mulkey be sentenced to death" or "We the jury, recommend that the defendant, Steven Richard Mulkey, be sentenced to life imprisonment without parole." (C. 197.)

---

[5]The evidence at trial indicated that Mulkey had adaptive strengths. Although adaptive strengths do not preclude a finding of intellectual disability, they are worth noting. For example, Mulkey lived on his own, had a job, was able to drive a vehicle, and was able to purchase two vehicles to aid him in effectuating his flight.

Additionally, the circuit court referred to the jury's sentence determination as a recommendation on several occasions. See (R. 1439-40) ("This aggravating circumstance, therefore, shall be considered by you in deciding whether to recommend a sentence of life without the possibility of parole or the death penalty."); (R. 1447) (informing the jury that 10 votes are necessary "in order to bring back a verdict recommending the death penalty" and that "less than 10 of you cannot recommend the death penalty"); (R. 1450) (instructing the jury on how to fill out the verdict form by stating that, "if you recommend the death penalty, then you would write your number here"). Mulkey did not object to the verdict form or the allegedly improper instructions. Therefore, this issue will be reviewed for plain error only.

Of course, a jury's penalty-phase verdict is now binding, see § 13A-5-47(a), Ala. Code 1975, and "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985). Despite the references to a recommendation, the circuit court also instructed the jury that "this is the time that it is your

39

duty to inform the Court as to what punishment should be imposed on the defendant for the crime of capital murder." (R. 1438.) Additionally, the venire was informed during voir dire by the State that its "verdict in the sentencing phase is binding upon the Court" (R. 255), and defense counsel argued to the jury during penalty-phase closing arguments that, "if 10 or more of you vote for death, he will get the death penalty," (R. 1419), and that "[y]ou're going to decide what happens to him. I'm not. [The prosecutors aren't]. [My co-counsel]'s not. Even the Judge is not. Because when you come out, your foreperson will read it and he will read out what the count is, and that's that." (R. 1420.)

This Court holds that the circuit court's references to a "recommendation" do not rise to the level of plain error because we find no merit to Mulkey's claim that the jury was misled about its role in sentencing. Therefore, this issue does not entitle Mulkey to any relief.

## VIII.

Mulkey argues that the circuit court abused its discretion by admitting the surveillance footage of the Kaos' murders. Specifically, Mulkey claims that the State failed to lay a sufficient predicate to authenticate the videos.

40

Analysis of whether the State met its burden to authenticate the videos is wholly unnecessary here because Mulkey has not, and could not, establish that he was prejudiced by any alleged error by the circuit court. Before the admission of the surveillance footage, Det. Ballard testified at length, without objection, about the contents of the videos. (R. 661-70.) In other words, the videos were cumulative to other lawfully admitted evidence and could not result in any prejudice to Mulkey. See Gobble v. State, 104 So. 3d 920, 959 (Ala. Crim. App. 2010). Additionally, Mulkey never contested that he had violently murdered the Kaos. In opening statements, defense counsel told the jury that "exactly what [the prosecutor] said happened, happens. That is what happens. There is a video of it." (R. 606.) In closing statements, defense counsel conceded that the evidence that Mulkey killed the Kaos is "overwhelming." (R. 1028.)

Mulkey cannot demonstrate that he was prejudiced by the alleged erroneous admission of the surveillance footage. See Rule 45, Ala. R. App. P. Therefore, this issue does not entitle him to any relief.

IX.

Mulkey argues that the circuit court abused its discretion by admitting gruesome, duplicative evidence in the form of photographs and video of the crime scene and the Kaos' autopsies as well as the surveillance footage that captured the murders. Mulkey asserts that the evidence was inflammatory and unnecessary because he had "provided a detailed statement to detectives, describing the crime and assisted authorities in locating the Kaos' bodies" (Mulkey's brief, at 77); thus, he asserts, the issues at trial related solely to his mental state and intoxication at the time of the crimes. Mulkey did not timely object to the evidence on the specific grounds raised on appeal.[6] Therefore, this issue will be reviewed for plain error only.

---

[6]The parties agree that Mulkey preserved this issue for appeal at least with respect to the surveillance footage. This Court, however, disagrees. Before trial, Mulkey filed what he styled as a "Defendant's Motion to Suppress Prejudicial Evidence," which asserted that the surveillance footage was unnecessarily prejudicial and therefore inadmissible pursuant to Rule 403, Ala. R. Evid. (C. 344-45.) That motion was denied before trial by the circuit court. (C. 79.)

Although an adverse ruling on a motion to suppress before trial preserves the issue for appeal, Mulkey's filing was not a motion to suppress because the motion did not assert that the evidence was secured illegally. See Bacot v. State, 597 So. 2d 754, 756 (Ala. Crim. App. 1992).

"Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So. 2d 368, 371 (Ala. Crim. App. 1986). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So. 2d 780, 784 (Ala. 1989). This Court finds no error, plain or otherwise, in the admission of the photographs or video. Therefore, this issue does not entitle Mulkey to any relief.

## X.

Mulkey asserts that the circuit court improperly excluded a qualified prospective juror. Mulkey refers to prospective juror D.R., whom the circuit court struck for cause due to a perceived bias. Mulkey asserts that the circuit court erred in striking D.R. because, he says, she

Despite its styling, because it challenged the evidence as being overly prejudicial, it was in substance a motion in limine. See id. Therefore, to preserve this issue for appeal, it was incumbent on Mulkey to "'object to the introduction of the proffered evidence or other matters and assign specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary.'" Id. at 757 (quoting Phillips v. State, 527 So. 2d 154, 156 (Ala. 1988)). Mulkey did object to the surveillance footage at trial but only on the ground of authentication. (R. 692-99.) Therefore, this issue is not preserved for appellate review.

had not indicated that she could not be fair or impartial even though she had indicated that she supported the death penalty and recognized the need for justice in this case.

"To justify a challenge for cause, there must be a proper statutory ground or '"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So. 2d 309, 321 (Ala. Cr. App. 1992) (quoting Nettles v. State, 435 So. 2d 146, 149 (Ala. Cr. App. 1983)). This Court has held that 'once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So. 2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So. 2d 55, 61 (Ala. Cr. App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror '"must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused"'; '"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So. 2d 979, 987 (Ala. Cr. App. 1993) (quoting Siebert v. State, 562 So. 2d 586, 595 (Ala. Cr. App. 1989))."

Ex parte Davis, 718 So. 2d 1166, 1171-72 (Ala. 1998). Further,

"'[t]he qualification of prospective jurors rests within the sound discretion of the trial judge.' Morrison v. State, 601 So. 2d 165, 168 (Ala. Crim. App. 1992); Ex parte Cochran, 500 So. 2d 1179, 1183 (Ala. 1985). This Court will not disturb the trial court's decision 'unless there is a clear showing of an abuse of discretion.' Ex parte Rutledge, 523 So. 2d 1118, 1120 (Ala. 1988). 'This court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised.' Knop [v. McCain], 561 So. 2d [229] at 232 [(Ala. 1989)]. We must consider the entire voir dire examination of the juror 'in full context and as a whole.' Ex parte Beam, 512 So. 2d 723, 724 (Ala. 1987); Ex parte Rutledge, 523 So. 2d at 1120."

Ex parte Burgess, 827 So. 2d 193, 198 (Ala. 2000).

D.R. was summoned for individual voir dire because she had mentioned recent personal issues:

Court: "All right. [D.R.], we brought you back because I know that you did indicate that you, I think, were recently widowed?"

D.R.: "Yeah, it ain't been a year yet."

Court: "Okay. And I think you also said something regarding your son?"

D.R.: "Yeah I lost my sister in August of '21. Lost [my husband] in May of last year. Lost my son in 2017 to Fentanyl."

Court: "Would the fact that you had those tragedies in your life, would that affect your ability to sit on this jury and to give both the State and the defense a fair and impartial trial?"

D.R.: "Well, as much as I wanted to do my civic duty, I didn't know the nature of this case. You know, no one did. … And [Mulkey] is about my son's age, a little bit younger. And my son kind of got messed up. I mean, he was in five rehabs, two jails and all of that. If you looked at the papers of LaShawn Williams, on her court, she knew him. She called me at home. She's a fine judge. Told me she was sorry. But I think it would, because as much as I believe in the death penalty and the victims need justice, [Mulkey] looks you know, he don't look like [my son], but my heart just – and if I see all of those pictures, if they're pretty graphic, my husband died in my arms. 23 good years of marriage. He had a massive MI. You know, and my son, I kissed in a cardboard box before I burned him. I have just had too much death. Too much."

Court: "Thank you for that, [D.R.] [Prosecutor]?"

State: "[D.R.], I just want to make sure that I'm understanding what you're saying correctly. It sounds like what you're telling us is that as you sat here through these past two days and you've viewed the defendant, Mr. Mulkey, your mind is going to your deceased son? Is that fair?"

D.R.: "Yeah, it's triggering a lot of stuff. I'm in a widows group trying to process all of this crap, and this is not good for me on a lot of levels. So, yeah, I think about my son [R.R.] I sure do."

State: "And does that cause you to have some sympathy towards Mr. Mulkey before you've even heard any of the evidence?"

D.R.: "Yeah I mean, you know, because I know [my son] could have messed up. He took a lot of stuff. I

46

caught him in my purse. He pushed me one time. He loved me and I loved him very much. And, you know, when you're on drugs and stuff, you do stuff that, you know, isn't in your nature. And we were good to him. I don't know. He said he just liked drugs. He was a doctor's son, spoiled rotten. And got – just a real smart guy. 36 on his ACT. Full ride to Penn State. Said he didn't want to go up there. It was too cold. Yeah, I look at [Mulkey] in court and I think about my son, what I should have, could have, would have. And if I see all of them pictures, man, I don't know for sure how I'm going to handle it. Because I'm dealing with a real, real difficult learning curve this last year anyway."

Court: "Understood, [D.R.]"

State: "I'm sorry for your loss. No further questions."

Court: "[Defense counsel]?"

Defense: '[D.R.], just very briefly I understand what you're going through and know how that can affect people from watching family members and that kind of stuff go through it. If you were selected on the jury, would the fact that Mr. Mulkey remind you or brings back memories of your son, would that cause you to be unfair to the State in listening to the evidence, or do you think that you would be able to put that aside and listen to the evidence and make a decision based on the evidence?"

D.R.: "Well, I have to be honest. You've got two decisions. One of them is leaning towards mercy, one of them is pretty black and white. And I probably would be more sympathetic because of the many at least eight years we struggled with

47

              [my son].  God only knows I mean, honestly, I don't know.  I can't say."

Defense:     "I understand.  So it sounds like you're not saying that you wouldn't consider if you thought that this case was deserving of the death penalty.  You wouldn't consider it.  But that you lean more towards a sentence of life without parole if you got to that penalty part?"

D.R.:     "I would think that's accurate.  I'm not against the death penalty and the crime in this case was egregious and the victims do need justice.  But considering what I personally have gone through and the transformation in young kids, young boys like this, you know, in my own son, and he had every privilege you could imagine, I would lean more towards mercy, I think, than I would be biased in that direction."

(R. 541-46.)

"A juror's bias need not be proved with 'unmistakable clarity' because 'juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.'" Taylor v. State, 666 So. 2d 36, 47 (Ala. Crim. App. 1994) (quoting Dutton v. Brown, 812 F.2d 593, 595 (10th Cir. 1987)).  D.R. acknowledged to the circuit court that she thought of her son, who had succumbed to drug addiction, when she saw Mulkey.  D.R. stated that her son had stolen from her and been violent with her while in the throes of addiction, which were similar to

the allegations against Mulkey. And D.R. readily agreed that she would "lean more towards a sentence of life without parole if [she] got to that penalty part." It is true, as Mulkey asserts, that D.R. did not state that she could not follow the law, but the circuit court was in the best position to assess D.R. and her ability to serve fairly on the jury.

"A trial judge's finding on whether or not a particular juror is biased 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" Martin v. State, 548 So. 2d 488, 490 (Ala. Crim. App. 1988) (quoting Wainwright v. Witt, 469 U.S. 412, 429 (1985)). Mulkey has failed to demonstrate that the circuit court abused its discretion in determining that D.R.'s bias would prevent or substantially impair her performance of her duties as a juror. Therefore, this issue does not entitle Mulkey to any relief.

XI.

Mulkey argues that the circuit court erred by allowing the State to cross-examine him without a factual basis and by allowing the State to make misleading arguments during the guilt-phase closing arguments. During cross-examination, Mulkey agreed with the State that his counsel had hired an expert to evaluate him for his mental state at the time of

49

the offense. The State later asked if the expert would be testifying, and Mulkey answered: "Not to my knowledge." (R. 974.) The State then argued during its closing that Mulkey's expert must have reached the same conclusion as the State's expert – that Mulkey was not suffering from a severe mental disease or defect. (R. 1020.) Mulkey asserts that the State lacked a factual basis as to the outcome of the defense expert's evaluation of him and that its argument in closing was misleading because Mulkey's expert was tasked only with performing an Atkins evaluation. Mulkey did not object to the allegedly improper questions or argument. Therefore, this issue will be reviewed for plain error only.

Mulkey placed his mental state at the time of the offense at issue; consequently, questions regarding Mulkey's evidence of his mental state were within the proper scope of cross-examination. See Rule 611(b), Ala. R. Evid. (establishing a broad scope for cross-examination). Further, the State's argument in closing was a reasonable inference from the evidence offered at trial. See Price v. State, 725 So. 2d 1003, 1031 (Ala. Crim. App. 1997) (recognizing that counsel for both the State and the defendant are allowed wide latitude in drawing reasonable inferences from the evidence in their closing arguments). This Court finds no error, plain or otherwise,

50

in the State's cross-examination of Mulkey or its arguments to the jury. Therefore, this issue does not entitle Mulkey to any relief.

XII.

Mulkey asserts that it is unconstitutional to sentence to death someone who suffers from a severe mental illness. The State's expert, Dr. Wilson, testified that Mulkey's mental-health history indicated that he had been diagnosed with bipolar disorder, major depressive disorder, psychotic disorder, and shizoaffective disorder. Mulkey argues that his mental illness lessens his culpability and opens the possibility that he could be rehabilitated through treatment.

This Court considered and rejected an identical claim in Keaton v. State, 375 So. 3d 44, 137-38 (Ala. Crim. App. 2021) ("To date, the United States Supreme Court has not held that either Atkins [v. Virginia, 536 U.S. 304, 321 (2002),] or Ford [v. Wainwright, 477 U.S. 399, 410 (1986),] prohibits the imposition of the death penalty for defendants who, though competent, are diagnosed with bipolar disorder, post-traumatic stress disorder, or other mental illnesses."). Therefore, this issue does not entitle Mulkey to any relief.

XIII.

Mulkey asserts that the circuit court erred in allowing the State to exercise its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Mulkey asserts that there was a pattern of strikes against black jurors and identifies several black prospective jurors who, he says, received disparate treatment in their questioning by the State.

Mulkey did not raise a Batson claim in the circuit court. In accordance with our holding Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024), "this Court will no longer review Batson claims under our plain-error standard when those claims are raised for the first time on appeal." Therefore, this issue does not entitle Mulkey to any relief.

XIV.

Mulkey argues that Alabama's death-penalty statute is unconstitutional because it fails to specify the method of execution. Mulkey asserts that this renders the statute unconstitutionally vague and ambiguous and his sentence arbitrary and capricious.

Section 15-18-82.1(a), Ala. Code 1975, states that "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia." The statute is neither vague nor ambiguous and does not render Mulkey's sentence arbitrary or capricious. Therefore, this issue does not entitle Mulkey to any relief.

## XV.

Finally, although no longer required by Rule 45A, Ala. R. App. P., this Court has reviewed the record in this case, and we find no plain error or defect in the guilt or penalty phase of the trial. See § 13A-5-53(a), Ala. Code 1975.

## XVI.

Section 13A-5-53(a) requires this Court to determine "whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence." As this Court discussed in Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ___ So. 3d ___ (Ala. Crim. App. 2023),

> "[w]hen the legislature removed the final sentencing decision from the trial court and placed it in the hands of the jury by Act No. 2017-131, Ala. Acts 2017, it amended § 13A-5-47, Ala. Code 1975, to remove subsection (d), which required the trial

court to make specific findings of fact regarding the existence or nonexistence of each aggravating circumstance in § 13A-5-49, Ala. Code 1975, each mitigating circumstance in § 13A-5-51, Ala. Code 1975, and any additional mitigating circumstances offered by the defendant pursuant to § 13A-5-52, Ala. Code 1975. Now, § 13A-5-47(b), Ala. Code 1975, requires the trial court to make specific findings of fact regarding the existence or nonexistence of aggravating circumstances and mitigating circumstances only in cases in which jury sentencing is waived. Because jury sentencing was not waived in this case, the trial court was not required to make specific findings of fact regarding aggravating circumstances and mitigating circumstances. In addition, Alabama's capital-sentencing statutes do not require the jury to render verdicts on the mitigating circumstances it found to exist .... Because we do not know which mitigating circumstances, if any, the jury found to exist, this Court cannot determine whether those circumstances were supported by the evidence."

___ So. 3d at ___.

As in <u>Iervolino</u>, jury sentencing was not waived; thus, the circuit court was not required to make specific findings of fact regarding aggravating circumstances and mitigating circumstances. Similarly, the jury was not required to render verdicts on the mitigating circumstances it found to exist. However, in addition to the statutory aggravating circumstances found to exist in the guilt phase, <u>see</u> § 13A-5-49(9), Ala. Code 1975, the jury rendered a unanimous verdict in the penalty phase finding that Mulkey had been previously convicted of a felony involving

54

the use or threat of violence to the person, see § 13A-5-49(2), Ala. Code 1975, and this aggravating circumstance was supported by the evidence.

In accordance with §§ 13A-5-53(a) and 13A-5-53(b), this Court has thoroughly reviewed the record, and we find that Mulkey's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Section 13A-5-53(b)(2) requires this Court to determine "[w]hether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence." However, "[w]ithout knowing which mitigating circumstances were found by the jury to exist, it is impossible for this Court to perform this part of our mandatory review of the death sentence in this case." Iervolino, ___ So. 3d at ___.

Finally, § 13A-5-53(b)(3) requires this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Mulkey was convicted of murder made capital for intentionally killing Siu Mei Kao and Ching Kao by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975.

Additionally, at the time of the Kaos' murders, Mulkey had been previously convicted of another felony involving the use or threat of violence to the person. Similar crimes have been punished capitally in Alabama. See Shaw v. State, 207 So. 3d 79 (Ala. Crim. App. 2014), and Broadnax v. State, 825 So. 2d 134 (Ala. Crim. App. 2000). After thoroughly reviewing the record, we conclude that death was the proper sentence in this case.

## Conclusion

For the foregoing reasons, this Court affirms Mulkey's capital-murder conviction and his resulting sentence of death.

AFFIRMED.

Kellum and Cole, JJ., concur. Minor, J., concurs in part and concurs in the result in part, with opinion, which Anderson, J., joins.

MINOR, Judge, concurring in part and concurring in the result in part.

I concur in all parts of the Court's opinion except Part IV. As to Part IV, I concur in the result.

Anderson, J., concurs.